1                    IN THE UNITED STATES DISTRICT COURT

2                        FOR THE DISTRICT OF MARYLAND

3                            SOUTHERN DIVISION

4   UNITED STATES OF AMERICA,        ) CRIMINAL
                                     ) NO. PX-17-382
5             Plaintiff,             )
                                     )
6   v.                               )
                                     )
7   LUIS ARNOLDO FLORES-REYES,       )
                                     )
8             Defendant.             )

9                 TRANSCRIPT OF SENTENCING PROCEEDINGS
                  BEFORE THE HONORABLE PAULA XINIS
10                    UNITED STATES DISTRICT JUDGE
                  WEDNESDAY, FEBRUARY 22, 2023; 10:06 A.M.
11                        GREENBELT, MARYLAND

12  APPEARANCES:

13  FOR THE PLAINTIFF:

14            OFFICE OF THE UNITED STATES ATTORNEY
              BY:  CHRISTOPHER M. SARMA, ESQUIRE
15            BY:  TIMOTHY F. HAGAN, JR., ESQUIRE
              6406 Ivy Lane
16            Suite 800
              Greenbelt, Maryland  20770
17            (301) 344-4431

18  FOR THE DEFENDANT:

19            LAW OFFICE OF JOSEPH A. BALTER, LLC
              BY:   JOSEPH A. BALTER, ESQUIRE
20            Mt. Washington Mill
              1340 Smith Avenue
21            Suite 200
              Baltimore, Maryland  21209
22            (410) 375-7082
                        -and-
23
    OFFICIAL COURT REPORTER:
24  Renee A. Ewing, RPR, RMR, CRR - (301) 344-3227

25        ***COMPUTER-AIDED TRANSCRIPTION OF STENOTYPE NOTES***

```
 1  APPEARANCES (Continued):

 2          LAW OFFICE OF CHRISTOPHER C. NIETO, LLC
            BY:  CHRISTOPHER C. NIETO, ESQUIRE
 3          1 North Charles Street
            Suite 1301
 4          Baltimore, Maryland  21201
            (410) 863-8189
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          (Call to order of the Court.)

2          THE COURT:  Good morning, everyone.  You can have a

3     seat.

4          (Counsel reply, "Good morning, Your Honor.")

5          THE COURT:  Would the government call the case.

6          MR. SARMA:  Good morning, Your Honor.  The case is

7     United States of America vs. Luis Arnoldo Flores-Reyes,

8     17-cr-00382.  We are here today for a sentencing for Mr. Luis

9     Flores-Reyes.

10         Christopher Sarma on behalf of the government.  I am here

11    joined at counsel table by Timothy F. Hagan.

12         THE COURT:  Good morning.

13         MR. HAGAN:  Good morning, Your Honor.

14         MR. BALTER:  Good morning, Your Honor.  Joseph Balter

15    and Christopher Nieto are court appointed on behalf of Luis

16    Flores-Reyes.

17         THE COURT:  Thank you.  Good morning.  And before we

18    go any further, let's swear in the certified court interpreter.

19         JOHNNIE BENNINGFIELD, INTERPRETER HEREIN, SWORN

20         INTERPRETER BENNINGFIELD:  Johnnie Benningfield.

21    Good morning.

22         THE COURT:  Good morning, Mr. Benningfield.  Good to

23    see you.  Thank you so much for your service.

24         MR. NIETO:  Your Honor, just for clarification, on

25    behalf of Mr. Benningfield, our client is not going to use his

1    service unless necessary.  He will just be in a standby

2    capacity.

3              THE COURT:  And we have to swear in Ms. Goldstein and

4    Ms. Blumberg.

5              SHELLEY BLUMBERG, INTERPRETER HEREIN, SWORN

6              MARTA GOLDSTEIN, INTERPRETER HEREIN, SWORN

7              INTERPRETER GOLDSTEIN:  Marta Sophia Goldstein,

8    federal court certified Spanish interpreter.  Good morning,

9    Your Honor.

10             THE COURT:  Good morning.

11             INTERPRETER BLUMBERG:  Shelley Blumberg, federal

12   court certified interpreter in Spanish and English.  Good

13   morning.

14             THE COURT:  Good morning.  Thank you, ladies, for

15   your service.  I understand that there may be victims who wish

16   to be heard, but they are not here yet.  Is that correct?

17             INTERPRETER BLUMBERG:  They are coming in.

18             THE COURT:  Oh, they are coming in.  Okay.

19        So, Government, at the appropriate time, just remind me

20   that we need to do that because there are a number of things

21   that we have got to do today.  All right?

22             MR. SARMA:  Of course, Your Honor.

23             THE COURT:  Okay.  First, I wanted to take up the

24   defense motion for a new trial at ECF 866.  The way I read this

25   motion, pursuant to Rule 33, is that the defense has sedulously

1  preserved all issues for appeal, but that there isn't going to

2  be much argument in this regard.  Am I wrong about that?  Do

3  you wish to be heard on this motion?

4          MR. BALTER:  No, Your Honor.  We are just going to

5  submit on that.  Thank you.

6          THE COURT:  Okay.  So I have reviewed the motion.  I

7  sat through the trial, considered the evidence, reviewed the

8  jury instructions and the jury verdict, and in my opinion,

9  under Rule 33, I am going to deny the motion.  The interests of

10  justice do not warrant a new trial.  The verdict was fairly

11  supported by the evidence.  And no other grounds that have been

12  asserted do I find should be revisited.  But there is always

13  the people upstairs.  Okay?  So that resolves 866.

14      Next, Mr. Flores-Reyes, today is your sentencing, so my

15  first question to you is:  Have you had enough time to review

16  the presentence report with your counsel so we can go forward

17  today?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  Okay.  And I know, Defense, you have a

20  number of objections, some of which are general, which I will

21  talk about in a moment, and I have got a -- I have got some

22  questions as well, so I want to do it this way.  Okay?

23      I am concerned that there is, certainly on the VICAR

24  count, there is a statutory mandatory life.  I do not credit,

25  as I haven't in the past, the argument that the statute,

1  despite its odd language, allows me to impose just a fine.  I

2  think the -- the prevailing law is clear in that regard.

3       So there is, in my view, a statutory mandatory life on

4  the VICAR count, but there are guideline adjustments that are

5  important even though they may not ultimately determine the

6  sentence that's imposed today.  We never know what's going to

7  happen in the future, and my mandate is I have to be clear and

8  accurate, and the guideline adjustments need to be supported by

9  the facts.

10      Before we took -- I took the bench, Ms. Dasovic and I --

11 from Probation, and she's in the courtroom today, we have gone

12 over the presentence report carefully, and I still have a

13 number of questions.  So I want to take the guideline

14 adjustments as calculated in the presentence report one by one

15 and make sure that I make a determination clearly on the record

16 so you know what you are doing going forward.  Okay?

17      Before we do that, though, Ms. Dasovic was good to point

18 out that there are two typos in the presentence report that she

19 caught.  One is at page 15, paragraph 75.  Count Two, the

20 length of the sentence was 12 years, not 12 months'

21 confinement, which is why we have a three-point adjustment for

22 that.

23      The second one is on page 25, the sentencing

24 recommendation, total offense level is not a zero.  It should

25 be a 43.  So if you'd make that correction as well.

1              MR. BALTER:  I'm sorry, Your Honor.  Where is that?

2              THE COURT:  That is on page 25.  It is the sentencing

3    -- it's titled, "Sentencing Recommendation."  It's the summary

4    of Probation's recommendation.  At the top, it says, "Total

5    Offense Level."

6              MR. BALTER:  Thank you.

7              THE COURT:  And those are the two typos that we

8    caught.

9         Were there any other from either party before we talk

10   about the guideline adjustments?

11             MR. SARMA:  Not from the government.

12             THE COURT:  So I am starting with the guideline

13   adjustments on page -- paragraph 35 because the way that this

14   has been done, and I have heard no specific objection that this

15   is contrary to the guidelines, the conspiracy count, which was

16   Count One, is very broad.  It had a number of different alleged

17   acts that constitute a pattern of racketeering and that were

18   also objectives of the conspiracy, and the way that Probation

19   has attempted to capture the total harm is to break them up

20   into groups, and I have heard no objection that that is not

21   what the guidelines warrant.

22             MR. BALTER:  Your Honor --

23             THE COURT:  Yeah.

24             MR. BALTER: -- that's not exactly true.  We have --

25   we objected to those groups --

1          THE COURT:  Right.

2          MR. BALTER: -- which were not the subject of jury

3  verdicts.

4          THE COURT:  And thank you for reminding me of that.

5  So what I meant by that was that there -- there wasn't any

6  objection as to the procedure; that, in other words, there is a

7  total -- total offense conduct that needs to be looked at,

8  there is related relevant conduct, and if that conduct is such

9  that under the grouping guidelines, the conduct does not group

10  because it's supposed to capture separate harms, then we break

11  it out into separate groups.  As to that procedure, there has

12  not been an objection.

13          You are correct, that you did object that -- if I am

14  getting it right, so tell me -- no evidence should be

15  considered in the calculation of the guidelines if it has not

16  been pled and proven by the jury and resulting in a separate

17  special finding.

18          Is that your general position on the guideline

19  calculations?

20          MR. BALTER:  That -- that is, Your Honor.  And,

21  again, if I could just go on this for -- for another moment.

22  So -- and it was my interpretation of the government's -- the

23  government's sentencing memo --

24          THE COURT:  And you can actually sit because it will

25  be easier to hear you if you are okay with that.

1          MR. BALTER:  It was my interpretation of the

2    government's separate sentencing memorandum that they were

3    alleging that it was -- that there should be groups assigned

4    based on the counts of conviction as opposed to proposing that

5    there be separate groups for various -- various facts allegedly

6    proved but not necessarily the subject of a verdict, just an

7    example.

8          There was the -- a separate group in the PSR with respect

9    to the attempted murder in Houston.  We objected to that as

10   both facts in the factual recitation as well as it being

11   calculated as a separate group because it wasn't proven, and as

12   I am understanding the government's position, they were not

13   alleging that that should be calculated as a separate group

14   either because it was not a specific count of conviction.

15          MR. SARMA:  If I could respond briefly, Your Honor?

16          THE COURT:  Sure.

17          MR. SARMA:  What we were trying to do in the

18   sentencing memorandum was just provide recommendations as to

19   what the sentence we believe should be on each count, and

20   because on count -- on the RICO conspiracy, as long as you get

21   to the underlying murder as an underlying activity, you are

22   going to get to 43, and so the guidelines is going to be -- is

23   going to be life.

24          THE COURT:  Right.  And I -- but at the same time, if

25   the government's position is that -- let's take the Houston as

1 an example -- is that it's relevant conduct to the conspiracy,

2 then Probation properly included it as a group; however, the

3 next question is:  Is the calculation fairly supported by

4 preponderant evidence?  And that is a separate inquiry.  If the

5 government's position is so long as I accept that the murder of

6 Raymond Wood -- am I getting that right?

7          MR. SARMA:  Yes.

8          THE COURT: -- triggers an Offense Level 43 as to

9 Count One and that essentially ends the inquiry in terms of the

10 guidelines, then what I will do is strike everything else,

11 frankly, to avoid.  Because what we will have to do, so that

12 everyone is clear, is if that is not the position of the

13 parties, then I am going to go through each group and we are

14 going to talk about whether it's relevant conduct, and if so,

15 is it supported by preponderant evidence because that is one

16 group?

17     Group two, I do have a problem with the way it is

18 calculated.  I do have a problem with the recitation of facts.

19 I don't believe that it is supported in the presentence report

20 by the preponderant evidence.

21     I have a similar problem with regard to the witness

22 tampering and retaliation.  I am not sure what the evidence is,

23 and I was going to turn to the parties to help me out in that

24 regard.

25     Lastly, group four -- we have had this conversation

1    before in Mr. Contreras-Avalos' case -- I don't believe that

2    the cross-reference to murder is supported by preponderant

3    evidence.

4         I thank you, Mr. Balter, for *United States vs. Montalvo*,

5    467 F. Supp. 3d 136.  Judge Arcara put words to -- better words

6    and much more clearly to the -- to the principle that we were

7    really hashing out in Mr. Contreras-Avalos' case.  And, so,

8    absent a better proffer, I don't see the Raymond Wood murder

9    that happened a year prior to the relevant evidence of drug --

10   of the drug conspiracy involving Mr. Flores-Reyes to have

11   enough of the overlap to be relevant conduct.

12        That's the sum and substance of it.  So if the

13   government's position is essentially none of those groups, for

14   guideline purposes, matter, then I will, by concession of the

15   government, strike them, and we will move on.  If they do

16   matter and you wish to be heard, then we will talk about them.

17        MR. SARMA:  So I think as to calculating the

18   guidelines for Count -- for Count One, I think we would agree

19   that we'd be willing -- that we are happy to strike the groups.

20        I do wish to be heard on what's in the PSR labeled as

21   group -- group four because as to Count Eight, I do want to

22   make a proffer on why I think, unlike the Contreras-Avalos

23   case, why I think the cross-reference should apply here.

24        THE COURT:  Okay.

25        MR. SARMA:  But for the purposes of calculating what

```
 1   the -- the applicable guidelines are as to Count One, I think
 2   we agree with the -- with the Court's plan to strike that --
 3   those portions of the PSR.
 4           THE COURT:  Okay.  So let's go through and be clear
 5   in this regard.  Group two, which is paragraphs 41 through 46,
 6   the government's position is it is appropriate, proper to
 7   strike, and that group shall just be -- we will just eliminate
 8   41 through 46.  And let me be clear, that doesn't mean you are
 9   barred from discussing the conduct as part of the sufficient,
10   but not greater than necessary, sentence, but for purposes of
11   guideline calculations strictly at this point, the juice isn't
12   worth the squeeze.  Am I getting it?
13           MR. SARMA:  That's correct, Your Honor.
14           THE COURT:  So, Ms. Dasovic, we can strike 41 through
15   46.
16           U.S. PROBATION OFFICER IRMA DASOVIC:  Yes, Your
17   Honor.
18           THE COURT:  Group three, which is the witness
19   tampering and retaliation as to Mr. Flores-Reyes, is the
20   government's position the same?
21           MR. SARMA:  That's correct, Your Honor.
22           THE COURT:  So that will eliminate 47 through 52.
23       Group four, you wish to be heard, and then that will be
24   the end of the groups.  Right?  And all depending -- even if I
25   -- well, let's see where we are.  So let's hear your argument
```

1    as to group four, why the murder cross-reference should apply

2    in the conspiracy to distribute and possess with intent to

3    distribute controlled substances.

4              MR. SARMA:  Sure, Your Honor.  So I -- I did read the

5    Western District of New York case that Mr. Balter cited.  I

6    think our argument is different here.

7         We are not saying that the murder of Raymond Wood should

8    -- the cross-application should apply merely because it was in

9    the same temporal period of the RICO conspiracy.

10        What we are saying is that Mr. Flores-Reyes was in a drug

11   conspiracy with other members of MS-13, including Mr. Ventura

12   in Bedford.  When Mr. Ventura sends the voice note that says,

13   you know, We found a chicken down here, we are going to kill

14   him and we are going to establish turf for the clique, we

15   understand that to mean -- I mean, it's reasonable to infer

16   what he is saying is this is going to become MS-13 controlled

17   territory in which we are going to be the ones selling drugs in

18   this area, not Mr. Wood.  And so the murder is in furtherance

19   of the drug conspiracy.

20        That's different, I think, from the Contreras-Avalos

21   murders where the testimony there was he was engaging in those

22   murders not to further the drug trafficking conspiracy but

23   merely to rank up within the gang.

24             THE COURT:  So can you refresh me as to what evidence

25   there was that contemporaneous with Mr. Wood's murder,

1  Mr. Flores-Reyes was engaging in drug trafficking activity?

2  Because my memory was that evidence was principally from early

3  2018, not 2017.

4          MR. SARMA:  So I think he was charged -- he was

5  convicted of both the conspiracy and with possession with

6  intent to distribute under a single count, so the evidence of

7  the controlled buys I think goes --

8          THE COURT:  I only have one count for conspiracy to

9  distribute and possess with intent to distribute --

10          MR. SARMA:  Right.

11          THE COURT: -- controlled substances.

12          MR. SARMA:  So I understand he's in a conspiracy to

13  distribute.

14          THE COURT:  Right.

15          MR. SARMA:  And I think there was evidence that he

16  was a homeboy and at certain points the First Word prior to the

17  Mr. -- before Mr. Wood's murder.

18          THE COURT:  Right.

19          MR. SARMA:  So the theory would be as being a homeboy

20  and the -- and at times the First Word, he is in charge of a

21  group of individuals engaging in a drug trafficking conspiracy,

22  and one of the goals of the Raymond Wood murder was to increase

23  the territory in which the Sailors clique was going to be

24  trafficking drugs.

25          THE COURT:  So if -- but to answer my question

1  directly, there wasn't any evidence akin to the 2018 evidence

2  of Mr. Flores-Reyes dealing drugs with any members of the

3  conspiracy a/k/a Mr. Ventura, for example, back in 2017?

4          MR. SARMA:  That's correct, Your Honor.

5          THE COURT:  Okay.  So the theory from the government

6  is liability flowing from his position as First Word and/or

7  homeboy and general testimony from your expert about MS-13 and

8  cliques in this region supporting the gang through drug

9  dealing, extortion, and things like that?

10         MR. SARMA:  And I would just add I think we also

11 heard testimony from individuals, including Michael Contreras,

12 who was also First Word at one point, that, you know, they --

13 they were -- the Sailors clique, in fact, was dealing drugs

14 prior to -- prior to 2018.

15         THE COURT:  Okay.  But -- but, again, so we are

16 clear, there isn't any -- even putting aside the specific

17 evidence of Mr. Flores-Reyes doing, like, a hand-to-hand at a

18 car, there isn't any WhatsApp or recorded calls where

19 Mr. Flores-Reyes is even discussing drug activity in the 2017

20 time frame.

21     Is there anything that I am missing in terms of that 2017

22 time frame that would support the drug conspiracy --

23 Mr. Flores-Reyes' participation individually in the drug

24 conspiracy in 2017?

25         MR. SARMA:  If I could just confer with Mr. Hagan for

1    a second?

2              THE COURT:  Sure.

3         (Counsel conferring.)

4              MR. SARMA:  Your Honor, just having now refreshed my

5    recollection, you are correct, Your Honor, we don't have any

6    WhatsApp or, you know, Concentra calls involving

7    Mr. Flores-Reyes in particular discussing drug activity prior

8    to the Raymond Wood murder.

9              THE COURT:  Or during -- during that time frame?

10             MR. SARMA:  Right.  Yeah.

11             THE COURT:  So there would really be -- the evidence

12   regarding Mr. Flores-Reyes and the drug conspiracy is confined

13   to that 2018 period.  Am I right about that?

14             MR. SARMA:  That's correct, yeah.

15             THE COURT:  All right.  Okay.  Thank you.

16        Mr. Balter.

17             MR. BALTER:  Yes.  Your Honor, I think, to a certain

18   extent, the government's argument is based on a construction of

19   the indictment, which makes Count Eight, which is a distinct

20   count involving drug activity alone, with making that

21   coextensive with the activities that were being pursued as

22   racketeering acts under -- under Count One.  And I think that's

23   an important distinction because, in essence, what the

24   government is saying is that, basically, anything that was

25   going on with regard to the enterprise, with regard to any

1   other activity in furtherance of -- of -- of the racketeering

2   conspiracy, that -- that is what -- that is what connects this

3   with -- with the murder, and that's just not how this is

4   charged.

5        The way it's charged is that is a distinct drug

6   conspiracy and that there is nothing there which has got the --

7   the -- the connection or the foreseeability or any other

8   relevant conduct with that -- with that murder.

9        I mean, the government, in its -- in its pleading, it

10  first basically only described the -- the drug activity of

11  Mr. Flores-Reyes as being -- being involved in the controlled

12  -- the -- the controlled sales.  And then they tried to force

13  the matter with respect to the Raymond Wood -- the Raymond Wood

14  act in -- in the sense that there was a -- an inducement or a

15  rouse about -- about marijuana or something which clearly

16  wasn't drug activity and which Mr. Flores-Reyes had nothing to

17  do with.

18       So, for -- for those reasons, Your Honor, I think that

19  there -- other than the -- the fact that they are charged in

20  the same indictment, there is -- there is not sufficient

21  connection, relevant conduct between the drug activity and --

22  and the murder to have the cross-reference apply.

23            THE COURT:  Okay.  So I am going to amend group four

24  and not apply the cross-reference.  I found *Montalvo* to be

25  instructive, but I want to say this about the way that I am

1    thinking about it for what it's worth.  Right?

2         I agree with Judge Arcara that the objective with the

3    guidelines is to have a blend of looking at the charges for

4    which a person is convicted, but then also looking at the

5    offense conduct that was proved by a preponderant evidence, and

6    it is trying to marry those two that sometimes becomes tricky.

7         In this situation, the -- the count/group for which I am

8    attempting to measure the harm is conspiracy to distribute and

9    possess with intent to distribute controlled substances.  And

10   under the relevant conduct guideline, I am told, for that

11   offense, I can look at, in the case of jointly undertaken

12   criminal activity, which is what this is, a conspiracy, all

13   acts and omissions of others that were, A, within -- or, one,

14   within the scope of the jointly undertaken criminal activity;

15   two, in furtherance of that criminal activity; and three,

16   reasonably foreseeable in connection with the criminal

17   activity.

18        The criminal activity at issue is the conspiracy to

19   distribute and possess with intent to distribute the drugs, not

20   the other way around.  It's not -- it's not necessarily the

21   entire racketeering conspiracy because I am asked to determine

22   what is the total harm for this particular group, and to do it

23   the way the government suggests would -- I think would confuse

24   the -- the foreseeability and the in furtherance piece.

25        So that's why I look -- I start by looking at the acts

1   surrounding the conspiracy to distribute and possess with

2   intent to distribute controlled substances and

3   Mr. Flores-Reyes' piece in that conspiracy.  I certainly find

4   that Mr. Flores-Reyes, in 2018, there was evidence, there was

5   preponderant evidence he did engage in a drug conspiracy that

6   supported the verdict as to Count Eight, and I do find that

7   that was also part of the larger racketeering enterprise

8   because it fueled the -- the ongoing operations of MS-13.

9        What I cannot find, though, is that a murder that

10   happened also as part of this very broad, wide-ranging

11   conspiracy back in 2017, before there was any evidence of

12   Mr. Flores-Reyes at all involved in drug activity, that that

13   murder is within the scope of the drug conspiracy and in

14   furtherance of that activity.  It's just -- it's -- it's

15   flipped.

16        If there were any evidence that Mr. Flores-Reyes, as part

17   of his role in MS-13 and in the racketeering activity in 2017,

18   was, you know, ordering, commanding, assisting, dealing in any

19   way with drugs that could have some link to Virginia, to

20   Mr. Ventura, to Mr. Wood, this might be a different analysis,

21   but there is simply nothing.

22        The government's argument is, essentially, because MS-13

23   is a very wide-ranging organization, it engages in lots of

24   criminal activity of all different kinds, once a person becomes

25   a homeboy or a First Word, that's it, they are responsible for

1    all of it.  That's kind of the upshot of it.

2        There isn't a whole lot more to the 2017 theory of

3    liability in my view, and that is not -- again, the Court above

4    me might disagree -- but that is not sufficient evidence,

5    preponderant evidence to find that the murder of Raymond Wood

6    was part of the drug conspiracy which is part of the gang

7    activity that occurred that Mr. Flores-Reyes engaged in in

8    2018.

9        So, for those reasons, I do not find that the

10   cross-reference applies.

11       So what does that mean?  Mr. Flores-Reyes was convicted

12   of the count.  There wasn't any quantities proven.  It was

13   based on the -- the testimony and the -- the photographic

14   evidence and the like, but because there wasn't any quantities

15   proven, Count Eight and this group receives an offense level

16   six.  I guess one, in theory, could say that there is a bump

17   for being an organizer or leader, but even that, I just don't

18   think it matters because whether it's a six or a ten, it's not

19   going to count for purposes of the grouping, and it is -- I can

20   account for the total harm caused regarding this particular

21   group and this particular count in the 3553(a) factors.

22       So, you know, unless you all feel strongly about this, my

23   suggestion would be that we eliminate the role as to the drug

24   conspiracy.  The drug conspiracy is a six.  It will not group.

25   And that will mean that we are at an offense level 43.  That

1   will be paragraph 66.  So let's make sure we are clear.

2       53 now becomes an offense level six.

3       Is there any objection to simply striking 56, role

4   adjustment, on the drug conspiracy?

5           MR. SARMA:  No, Your Honor.

6           THE COURT:  Okay.  The adjusted offense level, then,

7   for that group is six.

8       Is there any objection, other than the general objection,

9   Mr. Balter, to no -- you know, no adjustments shall be applied

10  unless they were pled and proven before the jury, but is there

11  any other -- is there any other objection to Count Ten and the

12  way that Count Ten was scored?

13          MR. BALTER:  I'm sorry.  You are going now --

14          THE COURT:  Yeah.  I am trying to go in order so that

15  I can clean up the -- just as we go in order because the

16  grouping -- at this point, the grouping is Count One -- Count

17  One and One-A, there is no group.  Right?  Count One-A -- One,

18  One, and One-A, there is no grouping.  Count Eight is a six, so

19  it's not going to result in an adjusted -- in an additional

20  unit.

21      And now we are on Count Ten, which, at a 24, is also not

22  going to result in an additional unit.

23          MR. BALTER:  Correct.  So, in other words, what --

24  before 53, we were at what's labeled group four --

25          THE COURT:  Right.

```
 1            MR. BALTER: -- which had actually to do with Count
 2    Eight.
 3            THE COURT:  Correct.
 4            MR. BALTER:  Now we are at --
 5            THE COURT: -- Count Ten.
 6            MR. BALTER:  It says Count Ten, but we are at the
 7    next group --
 8            THE COURT:  Correct.
 9            MR. BALTER: -- before 59.
10            THE COURT:  It's kind of both.  It's for Count Ten
11    and it's also the group for racketeering.
12            MR. BALTER:  Correct.  And, again, I did make an
13    objection not to the base -- this was a count of conviction.  I
14    did not make an objection to the base offense level 18.  I did
15    object to the specific offense characteristic of threat of
16    force and violence, which was a plus two, as well as the role
17    adjustment.
18            THE COURT:  Okay.  All right.  Mr. Sarma, do you want
19    to put on the record the evidence at trial which supported
20    those adjustments?  Because my memory is that there was
21    evidence of that, but I would feel best if you could refresh my
22    memory so that the record is clear.
23            MR. SARMA:  So, as to I guess paragraph 60, this
24    would be as to the -- the two-point enhancement if I am at the
25    right place.
```

1          THE COURT:  Yes.  So 60 and 62.

2          MR. SARMA:  Right.  So as to 60, the government would

3    cite the -- the wire call marked at Exhibit C2C.  This was a

4    conversation involving, among others, Michael Contreras, as

5    well as the defendant, and they are talking about what to do

6    with an owner -- a business owner of Langley Park who was not

7    paying.  Contreras says, The gang needs to grab this non-payer

8    by the, quote, the jaw, end quote, tighten it so that son of a

9    bitch knows.  The defendant, at that point, responds, Here is

10   Maloso.  Here is Maloso.  He already do it once with that son

11   of a bitch, which we understand to mean that Maloso had gone

12   and talked to him and grabbed his jaw, which would be evidence

13   of violence.

14         We have also heard ample testimony that within the

15   conspiracy, the extortion conspiracy, there were several other

16   cooperators who came in, Mr. Tejada-Cruz being one of the

17   examples who came in to testify about how he used violence and

18   carried a weapon with him when he was in charge of collecting

19   rents.

20         THE COURT:  Okay.  And that was for paragraph 60?

21         MR. SARMA:  That's correct.

22         And as to 62, the argument here would be that in his

23   position as First Word collecting -- you know, in charge of

24   collecting the rents on behalf of the entire gang and managing

25   the money, which is one of the roles of the First Word, that

1  would make him a leader, and that's why the four points --

2          THE COURT:  And that was coexistent in the time frame

3  of the evidence that was Exhibit 60?

4          MR. SARMA:  That's correct, Your Honor.

5          THE COURT:  Mr. Balter, do you have any different

6  recollection or wish to put on a factual proffer?

7          MR. BALTER:  Your Honor, let me just -- I will submit

8  on 60.

9      On 62, again, we -- I don't think with respect to

10 specifically the extortion part of this, which Mr. -- I don't

11 think that that -- the main focus of the extortion proof at the

12 trial had nothing to do with Mr. Flores-Reyes.  There were

13 others that was I think much more marginal evidence, and I

14 think that this inference that the government would have us

15 draw that because of the fact there was testimony he was -- he

16 was First Word and because of the fact there was expert

17 testimony as to what the role was, that necessarily with

18 respect to every activity that went on in this conspiracy, he

19 was a -- a leader and an organizer just doesn't flow.

20     So I think that there is a lack of evidence --

21 preponderance of the evidence that with respect to Count Ten,

22 he was a leader and an organizer, and I would ask the Court to

23 strike that four-level adjustment.

24     I continue my objection to the two levels, but I will

25 submit on the facts of that.

1      THE COURT:  Okay.  So I do find that the adjustments

2  are warranted, but in the alternative, I also find that it is,

3  for guideline purposes, it really matters not at all.  So to

4  the extent I have erred, it's, in my view, it's harmless

5  because we are at a 43.

6      But let me say this:  I do think that this is a different

7  analysis than in the controlled substance conspiracy because

8  there is no question that Mr. Flores-Reyes was in a leadership

9  position at the time that others were looking to him and

10 conversing with him about the extortionate piece of the -- of

11 the organization, and that they were not only conferring with

12 him but referencing his historical participation, and at that

13 time, being First Word necessarily means that you are

14 organizing more than five people.

15     And one of the key components that Mr. Flores-Reyes was

16 involved in -- it's like being the CFO of a company -- was the

17 extortionate piece.  And, so, unlike the drugs, which have a

18 different time frame and a different factual predicate, here,

19 there is more to at least satisfy the preponderant evidence

20 standard that not only were these -- was the extortion

21 involving threats of force and violence, but Mr. Flores was

22 organizing or leading that aspect of the criminal activity,

23 which, as First Word and homeboy, would include the kinds of

24 conversations that we heard on the wire and from testimony.

25     So I do find that the adjustments are warranted, but I

1    also find that at, whether it be Count Ten or group four, the

2    offense level is a 24 and it is not going to result in any

3    additional adjustment upward, and even if it did, the

4    guidelines are clear that because the offense level triggered

5    by the murder for Count One is 43, that's as high as we go.  So

6    even if there had been additional adjustments for the groups,

7    we would end up at a 43.

8         Okay.  So let's recap.  Going through, Count Ten remains

9    unchanged, so that means 59 through 64 remains unchanged.  The

10   grouping, we are eliminating Count One, One-A -- am I right

11   about that?  I am not sure.  We are eliminating Count One-A,

12   One-B.  Eight is now a six.  Ten is a 24.

13        Do I have that right, Ms. Dasovic?

14             U.S. PROBATION OFFICER IRMA DASOVIC:  Yes, Your

15   Honor.

16             THE COURT:  And that will result in paragraph 66

17   being 43; paragraph 67 being zero; combined adjusted offense

18   level 43, so that's paragraph 68; total offense level remains

19   the same.

20        Have I gotten all of the guideline changes correct?  Is

21   there anything I missed?

22             MR. BALTER:  Yes, Your Honor.

23             THE COURT:  Okay.

24             U.S. PROBATION OFFICER IRMA DASOVIC:  Judge, I have

25   one.  I believe that 66 should be 47 because the -- the total

1    offense level for Count One is 47, and then we go down to 43

2    because 43 is the highest.

3            THE COURT:  Got it.  I think you are right.  So this

4    should be a 47.  There was no adjustment for --

5            MR. BALTER:  Your Honor, if I could just -- because

6    we didn't talk about this before -- for the record, I would

7    object again to the leader/organizer.  I will submit on

8    argument with regard to that.

9            THE COURT:  Got it.

10           MR. BALTER:  But that 47 includes that four-level

11   bump.

12           THE COURT:  Yes, it does.  And I do find, by a

13   preponderant evidence, that the adjustment is warranted, and in

14   the alternative, it's likely harmless because we are at a 43 in

15   any event.  But to be clear, it is -- it would be a --

16   paragraph 66 is 47.  And so the combined adjusted offense level

17   at 68 is 47, but pursuant to the guideline directives at 71, we

18   are at a 43.

19           Thank you, Ms. Dasovic.  I appreciate that.

20           Any other objections, changes, corrections to the

21   presentence report, Mr. Balter?

22           MR. BALTER:  Yes, Your Honor.  And these are more of

23   a technical nature.  With respect -- just a moment, Your Honor.

24   They have to do with some technical issues on the criminal

25   history.  And let me just say that I -- the probation officer

1    and I met previously.  These were contained in my letter to the

2    Court, my sentencing letter of the 13th -- I'm sorry.

3                    THE COURT:  The 8th?

4                    MR. BALTER:  Yes, the 8th.  So this would be 894,

5    895.  The sealed document was 895.

6                    THE COURT:  Okay.  So it's paragraph 75, 82, 84?

7                    MR. BALTER:  Correct.  And so we did meet earlier

8    today because in our conversations, the information that was

9    contained in paragraph 75 with respect to the release date, the

10   rap sheet showed it was 2014.  Mr. Flores-Reyes' recollection

11   was it was 2013.  I don't know anywhere else to go to try to

12   resolve this.  I mean, the records that Probation has reflected

13   exactly what was in the PSR.

14        With respect to paragraph 82, the date of the deportation

15   proceeding being, Mr. Flores-Reyes alleges, 2013, not 2014.

16   Again, Probation records accurately reflect what was in the

17   PSR.  I -- again, I have -- I have told Mr. Flores-Reyes I

18   don't think that these issues are going to change life at BOP.

19                    THE COURT:  Right.

20                    MR. BALTER:  The record is made.  I don't know

21   anywhere further to go.

22                    THE COURT:  Right.

23                    MR. BALTER:  There were other issues with regard to

24   the personal pedigree information at the beginning of the

25   report.  Mr. Flores-Reyes objected to an alias that was

1    reported as Ivert Ruiz Maldonado.  Again, this was -- I

2    understand from Probation that this information would come from

3    this name coming up at some kind of booking event of the sort.

4         The same with regard to there are various DOB information

5    reflected, dates of birth of 11/1/79, 12/11/79, 12/31/79,

6    11/1/80, which are not his -- none of which are his dates of

7    birth.  Again, there was no -- we checked the records.  These

8    records were reflected in the rap sheet.

9         And, again, I don't think that these are going to

10   adversely affect him, but to the extent that it's necessary to

11   have a record about it, I will, for the record, request the

12   Court amend -- order the -- the report amended to -- to strike

13   this other extraneous information, but I have nothing further

14   to add about this other than that.

15              THE COURT:  Ms. Dasovic, would you mind just

16   summarizing the sources for this information just so that the

17   record is clear in that regard?

18              U.S. PROBATION OFFICER IRMA DASOVIC:  Yes, Your

19   Honor.

20        As far as the deportation date, that information was

21   received from the Immigration and Customs Enforcement.  That's

22   the date they have.  It's also on his rap sheet associated with

23   his FBI number.

24        And all of the names that I have listed in the report, as

25   well as the dates of birth, those were also obtained from his

1  rap sheet, which is associated with his FBI number, which is

2  unique to the defendant and his fingerprints.

3       THE COURT:  Okay.  So where I am with this,

4  Mr. Flores-Reyes, is it's not going to be material to my

5  sentence, and to the extent it matters for purposes of

6  administration going forward, the record reflects this is

7  largely coming from two sources: the FBI rap sheet and

8  Immigration and Customs Enforcement.

9       If it presents a problem to you down the line, contact

10 counsel and let them know.  But in terms of the probation, the

11 presentence report, it is -- there is evidence from two sources

12 which is sufficient to include the information in the

13 presentence report because I believe, as I mentioned, if I

14 didn't before, I will say it now, the presentence report is

15 used for sentencing today, but it also has other functions down

16 the road.

17      I think Mr. Balter is likely correct, this information is

18 not going to be terribly material, but in case it is, I am

19 going to keep it in the report.

20      And so the objections are overruled.

21      Government, anything?

22      MR. SARMA:  No, Your Honor.

23      THE COURT:  All right.  So with that and the changes

24 that we have discussed to the presentence report, I do adopt

25 it, and I thank you Ms. -- let me just ask one other thing

```
1   before I do that.  Mr. Nieto, Mr. Balter, have you reviewed
2   with Mr. Flores-Reyes the mandatory, standard, and proposed
3   special conditions of supervision that are included within the
4   presentence report?
5              MR. NIETO:  Yes, Your Honor.
6              THE COURT:  Mr. Flores-Reyes, do you understand the
7   mandatory, standard, and recommended conditions of supervision?
8              THE DEFENDANT:  Yes, Your Honor.
9              THE COURT:  Okay.  With regard just to the standard
10  and mandatory conditions, any objection to any of those?
11             MR. BALTER:  No, Your Honor.
12             THE COURT:  Okay.  All right.  With that, I adopt the
13  report in total.  Thank you so much, Ms. Dasovic, for a
14  wonderful job.  Really appreciate it.
15       Government, would this be a good time to hear from any
16  victims who wish to be heard?
17             MR. SARMA:  Yes, Your Honor.  I think we defer to how
18  you want to proceed.  One speaker, Jonathan Bonita Sorto, he is
19  the brother of Brandon Sorto who is one of the decedents
20  discussed in this case, and then we also would like to read a
21  letter into the record from Ms. Marjorie Stagno, who is the
22  mother of Raymond Wood.
23             THE COURT:  Okay.  And just so we are clear, any
24  victims in connection with this offense have been notified of
25  their right to be heard at this hearing?
```

1          MR. SARMA:  That's correct, Your Honor.

2          THE COURT:  Okay.  All right.  Well, I will -- you

3   tell me which one you wish to do first.

4          MR. SARMA:  Okay.

5          THE COURT:  Hi, sir.

6          MR. JONATHAN SORTO:  How are you doing?

7          THE COURT:  You are Jonathan Sorto?

8          MR. JONATHAN SORTO:  Yes, ma'am.

9          THE COURT:  Are you good speaking in English with me?

10         MR. JONATHAN SORTO:  Yes, ma'am.

11         THE COURT:  If, at any point, you'd like to have an

12  interpreter, you let me know.  Okay?

13         MR. JONATHAN SORTO:  Okay.  That's fine.  Thank you.

14         THE COURT:  All right.  What would you like me to

15  know, sir?

16         MR. JONATHAN SORTO:  How are you doing?  My name is

17  Jonathan Bonita Sorto, Brandon Sorto's younger brother growing

18  up.  You know, I come here today, you know, to speak about how

19  it really made our family feel, you know, on what had happened.

20  But, like, like, until now, I am still, you know, lost to what

21  would have made somebody, you know, think about taking somebody

22  else's life.  You know, like, how do that pop up in your head?

23  Like, what could he have done to you?  You know, I don't

24  understand what did my brother do so bad for you to come and

25  think it was right for you to take his life away, you know?

1          He was a good person.  You know, like, we all have our

2   wrongs.  You know, me, personally, I didn't grow up a bright

3   child or, you know, had everything given to me.  You know, I

4   still work hard now, you know, and take care of my family and

5   do what I need to do, but it breaks my heart, you know, that I

6   got two kids, a daughter and a son, and they are not able to

7   see their uncle, you know?

8          And my little brothers didn't get to see their older

9   brother, you know, growing up with them.  It was just me, you

10  know, being there for them.  And it's like -- I don't know.

11  Like, I am still lost, you know?  I still want to understand

12  what could have happened, you know, because I was just there

13  one day, you know, thinking my brother was going to come home

14  and leaving the door open for him thinking he was just going to

15  walk in through that door, and the next morning, I am hearing

16  my brother, they found my brother, you know, at a place that we

17  used to walk through as kids, you know.

18          And all my brother ever wanted was just to have friends.

19  You know, I don't know -- it could have been all -- I don't

20  know.  I really don't -- I am coming up here not even knowing

21  what to really say because I am just mostly hurt, you know?

22  And it really has torn our family apart from us losing our

23  father as well, you know, so it's just been my mother, you

24  know, it's always just been her, you know, taking care of us

25  five kids, you know, and it's hard.  Like, until now, it's

1    hard, you know?

2            THE COURT:  Yeah.

3            MR. JONATHAN SORTO:  Just -- just really -- I just

4    really thought, like, whatever happens today, you know, I could

5    be able to forgive the person, but it's just, you know, I

6    rather would have had my brother here, you know?  Apart from

7    everything that we have been through, I would have just wanted

8    him to be here to experience everything that I experience now.

9            Like I said, we didn't have everything given to us, you

10    know, so it was just us trying to find people we could fill

11    like -- they could fill that empty space in our life, you know?

12    Apart from my mother always working, we just always looked for

13    friends.  I don't know if he looked for the wrong friends, you

14    know, and those wrong friends end up taking his life.  You

15    know, he's just -- that's all he ever wanted was to be, you

16    know, known by people as a good person, you know?

17            I really do appreciate everything you guys have done.

18            THE COURT:  Of course.

19            MR. JONATHAN SORTO:  That's all I can really say.

20            THE COURT:  Well, I am so sorry for your loss, and I

21    do hope that coming here today and, you know, speaking from

22    your heart helps you heal a little bit.  I can't imagine you

23    are ever going to get over the loss of your brother, and your

24    family is going to have that hurt with them forever, but if we

25    did a little bit to help today, then -- then that is, you know,

1   a little bit of a silver lining in an otherwise bad cloud.  So

2   I do thank you.

3            MR. JONATHAN SORTO:  Thank you.

4            THE COURT:  Okay.

5            MR. SARMA:  If I may read the letter in as well, Your

6   Honor?

7            THE COURT:  Sure.

8            MR. SARMA:  I guess so the record is clear, this was

9   previously prepared for a prior sentencing.  It's the same

10  content, but the mother asked us to read it again today.

11           THE COURT:  Okay.

12           MR. SARMA:  Dear Judge, I am Raymond Charles Woods'

13  mother.  I am writing this on behalf of myself and my family.

14       On March 27th, 2017, our world came crashing down.  My

15  son, Raymond, went out the front door and never came back, and

16  that was around 8:30 p.m.  When I received the phone call at

17  11:03 p.m., I attempted to call Raymond's cell phone, and it

18  went to voicemail, which it, in all caps, never does.  I

19  started to panic because this was so out of character for him.

20       When I made it home, I started making phone calls to

21  friends and eventually to the local hospital.  I drove around

22  the neighborhood.  Then, around 3:30, I walked my dog, and

23  there on the front lawn, I found his glasses, a ski mask, a $10

24  bill, and on the road, I found his cell phone.  That's when I

25  knew something bad happened to my sweet boy.

1        I drove to the police station.  They were not open.  I

2   went to the hospital in person.  No one there that matches my

3   son's description.  So I called the police around that time.  I

4   started preparing myself for the worst because you see, me and

5   my son were very close.  He always answers my calls and he

6   never stays out all night.

7        My son was a sweet boy, about to graduate and head off to

8   the Marines and live his life, but instead, he was brutally

9   murdered by the hands of the most notorious gang, the MS-13,

10  that have spread their violence all over the United States and

11  are embedded in our own backyards.  My sweet boy did not know

12  his friends were involved with this gang and met them by

13  chance, and they saw an opportunity to kill for the benefits of

14  themselves and gaining more power, new names, and ranking.

15       My family will never be the same.  There is a void that

16  is missing and it's not right.  And for me to know that his

17  last words as these four evil people kidnapped and stuffed him

18  in the car were, Mom, Mom...

19       I bought that house as a single mom for my boys for it to

20  be a protective home for them, and they destroyed it.  I had to

21  sell it.  I could not handle my high-paying job, but now I am

22  on part-time work.  I am still undergoing therapy.

23       Judging these men before you did not -- Judge -- sorry.

24  Judge, these men before you did not kidnap nor brutally murder

25  my son, but they were the ones that gave the, quote, green

1   light, which is the permission to do so.  To me, that just

2   blows my mind how this sickening gang works.  In all caps, all

3   of them need to be stopped even if it is one by one.  Please

4   give them the maximum sentence allowable by law.  They are part

5   of an inhumane gang that needs to be stopped and a message

6   needs to be sent.

7        From the grieving mother of Raymond Charles Wood.

8             THE COURT:  Government, any other victim

9   presentations?

10            MR. SARMA:  No, Your Honor.

11            THE COURT:  Okay.  All right.  Let's next turn to the

12   sufficient, but not greater than necessary, sentence.  I will

13   start with the government and then hear from the defense.

14            MR. SARMA:  Thank you, Your Honor.

15        I will go through these fairly quickly because I think we

16   have laid out a lot of this in our papers.  I will start with

17   Count Seven, which I think we have already addressed today.

18   This is the VICAR murder.  We agree with the Court's reading

19   there, that it's mandatory life in this case.

20        As to Count One, this is a conspiracy to participate in

21   the racketeering enterprise, there was a special finding made

22   by the jury that the murder was -- you know, there was a

23   special finding that he was involved in the murder of Raymond

24   Wood, which leads us to a guidelines range of 43, and we think

25   that life, indeed, is appropriate under the 3553 factors.

1          Turning to, you know, the offense itself, this was a

2    horrible murder.  You know, as we just heard from that letter,

3    the facts are brutal and the victim was a child.

4          As to the specific deterrence, we would note from the PSR

5    that Mr. Flores-Reyes had spent a significant period of time

6    incarcerated, and then when he got back out, returned to his

7    criminal activity, including participating -- participating in

8    this murder.

9          As to general deterrence, even though it's -- it's hard

10   to continue to try to make this argument given that we continue

11   to have these cases in this district, we do, and the U.S.

12   Attorney's Office really do hope that when people get life for

13   these murders, we can convince individuals not to join MS-13,

14   not to engage in these kinds of crimes because the penalties

15   will be harsh.  And any time we can get a life conviction and

16   try to tell people, If you get caught up in this gang, if you

17   get caught up in murders, you are going to spend the rest of

18   your life in jail, I think that is an effective message.

19         And the last relevant 3553 factor I'd like to point out

20   here is, you know, Your Honor has already had to go through the

21   process of sentencing other defendants in this case, including

22   on this specific murder, and have given concurrent life

23   sentences on the RICO count based on this murder.

24         As to Count Eight, this would be the drug trafficking

25   conspiracy, now that -- based on the revision to the PSR with a

1    base -- a base offense level I think of six now, I think my

2    quick math was that would be a two- to eight-month guideline

3    range.  Here, the government would ask for a five-year -- you

4    know, an upward -- an upward variance; quite frankly, the

5    reason being that, you know, there was evidence established at

6    trial that one of the ways that MS-13 goes about funding its

7    violent activities is through the selling of marijuana and

8    other drugs, including the drugs that Mr. Flores-Reyes was

9    engaged in dealing with, and we think that that is one reason

10   to have an upward variance.

11       We'd also say as to the 3553 factors, you know, there was

12   evidence at trial from the expert that the way that the gang

13   begins is you start out at the parlor level selling drugs and

14   you quickly escalate to murder, and I think we want to be able

15   to show that -- I think it's true in these cases that people

16   engaging on behalf of MS-13, the drug offenses are quickly

17   leading up to violent crimes or helping to fund violent crimes,

18   and we think considering that context, we think an above

19   guidelines range is appropriate.

20       And lastly, as to sentencing disparities, I believe -- I

21   just don't have it offhand now -- I believe that

22   Mr. Contreras-Avalos received I think about five years for his

23   role in the drug trafficking conspiracy, and we would say that

24   Mr. Flores-Reyes at least deserves a similar sentence even

25   though the evidence at trial was a little bit stronger.  It's

1  true that we didn't prove up a weight, but there were

2  controlled buys.  You know, the jury did see the drugs that

3  were sold by Mr. Flores-Reyes that were part of those

4  controlled buys.

5       And then lastly, as to Count Ten, we would ask for 78

6  months to run concurrent for the extortion conspiracy, which

7  would be at the very top end of the guidelines.  The theory

8  here would be very similar as to the drug trafficking

9  conspiracy.  The point of the extortion is to fund the other

10 activities within MS-13.

11      We would also say, as to general deterrence, we want to

12 send a message to those engaging in terrorizing the Langley

13 Park community that even if you don't rise to the level of

14 committing a murder, if you are extorting businesses in Langley

15 Park on behalf of MS-13, you will receive harsh sentences

16 because it is really destroying law-abiding citizens, or, you

17 know, law-abiding residents of that area.

18      You had two victims come and testify at -- about kind of

19 the trauma of having to deal with one of the other codefendants

20 who was extorting them, and I think it's a serious offense and

21 we should take it, and so that's why I think there should be a

22 top of the guidelines sentence as to the extortion.

23      Moving on to supervised release, as we did with

24 Mr. Contreras-Avalos, we would argue for five years of

25 supervised release.  The theory would be similar.  You know, we

1   don't expect Mr. Flores-Reyes to ever be released from prison,

2   but should there come a day when he is, he should be deported,

3   but we still think supervised release still provides a

4   deterrent.  If he is then deported, it would be deterrent from

5   him returning to this country, and because we understand that

6   he has family in this country, he would have a motivation to

7   return.

8           And then lastly, I want to talk about restitution, which

9   I do think is a point of some litigation or motions --

10          THE COURT:  We may not be able to resolve restitution

11  today because there is now a live question of fact and law that

12  was put before me, like, days ago --

13          MR. SARMA:  Understood.

14          THE COURT: -- with regard to this motion to turn over

15  money, which, according to the defense, should have been given

16  back to the defendant when I granted suppression.  So that's

17  it's own, you know, issue that I am not prepared --

18          MR. SARMA:  Okay.  So I won't --

19          THE COURT: -- to deal with today.  And so I think we

20  should set in a restitution hearing.  You all -- you can let me

21  know at the appropriate time whether you have had any

22  conversations about whether this can be resolved short of a

23  hearing, but that legal question is -- that's a live one in my

24  view.

25          MR. SARMA:  Okay, Your Honor.  In that case, I will

1    settle on that.

2              THE COURT:  Okay.

3              MR. SARMA:  Thank you, Your Honor.

4              THE COURT:  All right.  Thanks.

5         Okay.  Mr. Balter.

6              MR. BALTER:  Your Honor, I am mindful of the Court's

7    ruling with regard to its interpretation of 1950 -- 1950 -- 18,

8    U.S.C., 1951(a)(1), that it is the Court's interpretation it

9    mandates a life sentence in this case.  We noted our exception

10   to that in our letter.  I will submit with respect to that.

11        In light of that ruling, we have nothing further to add.

12             THE COURT:  Okay.  So, Mr. Flores-Reyes, this is your

13   opportunity to be heard if you wish.  You do not have to speak.

14   You have an absolute right to remain silent, and I will not

15   hold your silence against you.  But if there is anything you

16   wish to say, now would be the time before I impose sentence.

17             THE DEFENDANT:  Just thank you for all the attention

18   in this case.  And I want to thank all my lawyers for all they

19   have done, and I am very remorseful about everything, and I am

20   going to leave it there.

21             THE COURT:  Okay.  And I understand why, and I do

22   want to separately also thank your counsel.  They have done an

23   admirable job as always.  They are, you know, really the best

24   of our Criminal Justice Act panel, and without them, our system

25   of justice wouldn't be, in my view, you know, the best that it

1   is.  So I thank you for thanking them.  They deserve it.

2       (It is the policy of this court that every guilty plea

3   and sentencing proceeding include a bench conference concerning

4   whether the defendant is or is not cooperating.)

5       THE COURT:  I have had to impose sentence too many

6   times in these cases.  It just is an overwhelming plague on our

7   community to have MS-13 dominate these streets as much as it

8   does, and it really does.  I mean, we are a stone's throw away,

9   this courthouse, from where the gang, which feels like it's its

10  own entity, sucks up humans, and humans go in one of two

11  directions.  They either end up where you are,

12  Mr. Flores-Reyes, or they end up dead, but they don't end up

13  often, at least the evidence is, getting out.  And the

14  government seems to be, you know, drinking from a fire hose in

15  terms of bringing these cases one after another after another.

16      I find this day to be particularly tragic because a young

17  boy, I mean a boy, lost his life horribly, and we don't need to

18  revisit that evidence.  That is in the record.  But it's --

19  it's the thing of nightmares for parents and brothers.  Another

20  man brutally lost his life, and, you know, Mr. Sorto said it

21  best, for what?  For happening to have the wrong friends in the

22  wrong place.

23      But we have also lost your life, Mr. Flores-Reyes, and

24  that doesn't go unnoticed by me.  You know, I remember you at

25  trial.  You were always very respectful.  Mr. Nieto brought out

1    that you had so many other things that you were doing, like, am
2    I right?  There was a -- you were teaching people how to cook.
3    You know, you are not just the sum of these horrible acts, but
4    you do need to -- you do need to, unfortunately, atone for them
5    with your own life.  That's what the law tells me I must do,
6    and, frankly, it's warranted, the evidence, it is warranted,
7    and that's a heartbreaking, regretful place for us all to be.

8         But it is supported by the evidence at trial, so even if
9    there were not a statutory mandatory minimum, the nature of
10   these murders, your involvement in these murders -- you don't
11   have to be the one that plunges the knife or cuts off a limb to
12   be responsible -- makes it such that life is warranted.

13        It is also the sentence as to Counts One and Seven, which
14   reflects the seriousness of the offense.  It doesn't get any
15   more serious than this particular racketeering enterprise.  The
16   evidence at trial that demonstrated how it does destroy
17   communities, lives, families, people, and your participation as
18   a homeboy and the First Word and your direct involvement in the
19   acts of this conspiracy, as was laid out in nearly two weeks of
20   testimony and evidence, is among the most serious.

21        A sentence less than life would not promote respect for
22   the law.  One of the signatures of this gang is it shows no
23   respect for human life when individuals like Mr. Wood and
24   Mr. Sorto can lose their life so brutally.  And, so, if not the
25   law here to promote respect, then where?

1          It does avoid unwarranted disparity.  Others who have
2   committed similar crimes who have been part of this conspiracy
3   have also received a life sentence because it is, indeed,
4   warranted.
5          We can only hope it deters.  There is two sides of that
6   story for sure.  Defense often cites to me legion of studies
7   that sentences don't work, but to the extent I must take it
8   into account, I do find that specific and general deterrence
9   are certainly supported by the -- by the sentence.
10         And Mr. Flores-Reyes, it does take into account your
11  individual history and circumstances.  I think life could have
12  gone so differently for you.  It is tragic that it hasn't.
13  Despite how you appear and -- and are in court and with your
14  counsel, this isn't your first rodeo.  Your prior convictions
15  are not nearly as serious as this, but you were given prior
16  times of wake-up calls that you got to make different choices.
17         Life certainly wasn't easy for you either as a child.
18  That is clear.  But it doesn't -- first, under the statutory
19  law, I can't -- I can't do anything less than life under Count
20  Seven, but I don't, even taking into account your history and
21  circumstances, believe that that would be a sufficient, but not
22  greater than necessary, sentence.
23         I will leave you with this:  I am a believer in change
24  and anyone can change.  This is going to sound a little cooky,
25  but your life is not over.  There are people in your life who

1  clearly care about you and who do not want to see life for you

2  end today.

3      Prison is no cakewalk.  It's not easy.  But there are a

4  lot of people who can actually benefit by your making a change

5  and making a difference.  It will remain to be seen whether you

6  do.

7      And we don't know where the law is going to go from here.

8  The law has changed so much in the last several decades, and

9  you are a young man, so I think you have lots of incentives to

10  decide that I am not the sum of today, and one way if -- in

11  your -- you know, this is in you.  I can't -- I can't imagine

12  what's in you right now, but if there is some glimmer of hope,

13  I think it would be to try to make amends for those lives who

14  have been lost by making some changes in your own so that you

15  are not lost to this horrible gang forever.

16      So that's my two cents.  What you do with it remains to

17  be seen.

18      So, for those reasons, the sentence of the Court is, as

19  to Count One, life imprisonment, followed by five years of

20  supervised release.

21      Count Seven, life imprisonment, followed by five years of

22  supervised release, concurrent, both the prison term and the

23  supervised release, to Count One.

24      Count Eight, I will upwardly vary to five years for the

25  reasons stated by the government.  I do find that the drug

1    conspiracy piece of this does fuel this gang.  It fuels the --

2    it's, in part, the life blood.  It is what I imposed in

3    Mr. Contreras-Avalos' cases for similar reasons, and so I do

4    find that that upward variance is warranted.  There is a

5    three-year term of supervised release that will run concurrent

6    with One and Seven.

7            As to Count Ten, I will impose a 78-month sentence.  That

8    is the top of the guidelines.  It's also sufficient, but not

9    greater than necessary.  It's a bit higher than on the drug

10   piece of it, and that is because it is also a direct terror on

11   the individuals who have been extorted, that they are the ones

12   -- and this is Count Ten, I'm sorry -- that they are the ones

13   who have to face threats of death and violence if they don't

14   give over what nickles they rub together from running things

15   like illegal beer operations or brothels and other things that

16   don't necessarily help our community, but that doesn't merit

17   the kind of extortionate activity that is the subject of Count

18   Ten.  Three years of supervised release concurrent to the

19   Counts One and Two (sic).

20           There won't be a fine.

21           We will defer restitution for another day.

22           There is a $400 special assessment that you will pay, I

23   suppose, over time through the Inmate Financial Responsibility

24   Program.  You may want to see if you can get that paid now so

25   that you don't have to deal with it going forward.  Obviously,

1  this will be part of I think the conversation on restitution

2  and what happens to that sum that was seized; that it's the

3  defense position it should be turned over to Mr. Flores-Reyes

4  or a member of his family, I suppose.  We will talk about that

5  at restitution, at the restitution hearing.

6       Is there any aspect of the sentence that I have neglected

7  to address?

8            MR. SARMA:  Not for the government, Your Honor.

9            MR. BALTER:  I'm sorry, Your Honor.  What was the

10 sentence on Count Eight?

11           THE COURT:  Count Eight is 60 months.  Did I say it

12 incorrectly?

13           MR. BALTER:  Okay.

14           THE COURT:  60 months.  And three years supervised

15 release concurrent.

16           MR. BALTER:  As -- as explained, there is no

17 exceptions.

18           THE COURT:  Okay.  All right.  So you probably

19 already know this, Mr. Flores-Reyes, you have the absolute

20 right to appeal, and you have to do so within 14 days from

21 today, so certainly speak to your counsel today about noting

22 your appeal.

23       Mr. Ulander, have I missed anything?

24           THE DEPUTY CLERK:  The supervised release.

25           THE COURT:  Oh, the standard and mandatory

1  conditions, yeah.  Yeah.  Yeah.

2      So, in addition to the standard and mandatory conditions

3  for supervised release, we have not gone over special

4  conditions.  So let me just -- okay.  So the additional special

5  conditions of supervision are that, first, you are to, if

6  warranted, if noted under the law, you have to surrender to the

7  U.S. Immigration and Customs Enforcement Service and follow all

8  their instructions and reporting requirements until any

9  proceedings are completed: deportation, removal, or otherwise.

10      If you are ordered deported or removed from the United

11  States, you must remain outside the United States unless

12  legally authorized to reenter.  If you reenter the United

13  States, you must report to the nearest probation office within

14  72 hours after your return.

15      You must not communicate or otherwise interact with any

16  victim or victim's family either directly or through someone

17  else without first obtaining permission of the probation

18  office.

19      And you must not communicate or otherwise interact with

20  any known member of a gang without first obtaining the

21  permission of the probation officer.

22      I am not going to impose recommended conditions five and

23  six.  I don't see them as necessarily warranted.

24      With regard to restitution, we will discuss at a

25  restitution hearing what restitution is owed and how

1    Mr. Flores-Reyes -- his ability to pay it.

2         If there is outstanding restitution that is not otherwise

3    satisfied, there will be an outstanding monthly payment when

4    Mr. Flores-Reyes, if he is ever on supervised release, I will

5    make that $50 per month, and, again, this is conditional.

6    Right?  We have to get to the question of restitution, get to

7    how it will be paid, but in the event there is a restitution

8    order and Mr. Flores-Reyes is on supervision at any point, then

9    -- and it's not otherwise satisfied, there will be a $50 per

10   month payment.

11        The $400 special assessment, to the extent it's not

12   otherwise paid, will be a condition of supervision to satisfy

13   that in the event that Mr. Flores-Reyes is placed on supervised

14   release.

15        Any questions with regard to the mandatory, standard, and

16   special conditions as announced?

17             MR. SARMA:  No, Your Honor.

18             THE COURT:  No?

19             MR. BALTER:  No, Your Honor.

20             MR. NIETO:  No, Your Honor.

21             THE COURT:  Did I leave anything out, Mr. Ulander?

22             THE DEPUTY CLERK:  I think we are all good.

23             THE COURT:  Is there anything else from either side

24   then?

25             MR. BALTER:  Your Honor, just to clarify my -- my

1  statement before with regard to the no exceptions after the

2  Court pronounced sentence, I meant with regard -- no questions

3  about what the Court's sentence was.  Obviously, to the extent

4  that we -- that we lodged objections previously, we are

5  continuing those objections.

6           THE COURT:  Okay.  And the record is preserved in

7  that regard.

8           MR. BALTER:  Thank you.

9           THE COURT:  Is there any recommendation for

10 designation or programming?

11          MR. BALTER:  Just as close to the Maryland area as

12 possible.

13          THE COURT:  Okay.  Any other programming that you

14 wish for me to put in the judgment?

15          MR. BALTER:  No, Your Honor.

16          THE COURT:  Okay.  Let's set our restitution hearing.

17 The law allows us for up to 90 days to resolve this.

18     Where do you propose I start looking for a date?  April?

19          MR. HAGAN:  Your Honor, early April would work for

20 the government.

21          THE COURT:  I can give you all April 3rd.

22          MR. BALTER:  April 3rd would be fine, Your Honor.

23          THE COURT:  Okay.  I am going to say April 3rd at 11

24 a.m.  I really urge you all to meet and confer and see if you

25 can come to some resolution.  If you can't, I will need

1    follow-up position papers.  You don't necessarily have to, you

2    know, respond.  Just tell me where you are a week before the

3    hearing if there is anything to add to what you have already

4    briefed.

5          And I would hope there would be some response from the

6    government on why the defense's position, which, you know, in

7    my view, is, at least at first blush, seems credible, why it

8    shouldn't control?  That if -- if I suppress the evidence back

9    years ago now, I think it was before the pandemic or close to

10   it, that -- why that money shouldn't have been turned over, and

11   if it had, then why is it subject now to just a wholesale

12   diversion because restitution will be joint and several with

13   the other codefendants, and it just seems like a result that's

14   not necessarily equitable and maybe not borne out by the law.

15   That's what I would like for you all to address.

16          MR. SARMA:  I think Mr. Hagan at the last -- late

17   last night might have filed something on that point.

18          THE COURT:  Oh, is that right?

19          MR. SARMA:  Yes.

20          THE COURT:  That's what you get for --

21          MR. SARMA:  Indeed.

22          THE COURT:  -- late night.  I mean, I like to say I

23   am good, but I am not that good.

24          MR. SARMA:  I woke up this morning to it as well,

25   so...

1              THE COURT:  Great.  So I am not the only one who is

2       like, What?  Okay.  So we will reconvene on April 3rd.

3          Does Mr. Flores-Reyes wish to be present for that

4       hearing?  Do you all want to talk about whether he waives his

5       personal presence?

6              MR. NIETO:  The Court's indulgence if we may.

7              THE COURT:  Sure.

8          (Counsel conferring.)

9              MR. BALTER:  Your Honor --

10             THE COURT:  Yes.

11             MR. BALTER: -- Mr. Flores-Reyes prefers to be present

12      at the hearing.

13             THE COURT:  He would be?

14             MR. BALTER:  Yes.

15             THE COURT:  Okay.  So then I would take it that means

16      the marshals will keep Mr. Flores-Reyes relatively local.  You

17      know that that's relative these days.

18             MR. BALTER:  Right.

19             THE COURT:  But --

20             MR. BALTER:  Your Honor, if I could, I -- I can't

21      recall this coming up before, but as I understand it now, the

22      Court will be issuing a judgment?

23             THE COURT:  Yes.

24             MR. BALTER:  And just, again, for the technical parts

25      of this, the notice of appeal will run from the time the Court

```
 1    -- the Court enters the judgment now, but there would

 2    potentially be a subsequent judgment with a new period to lodge

 3    a notice of appeal following the Court's restitution order?

 4           THE COURT:  I think that's -- that is correct, and I

 5    think as it -- maybe this is my out of an abundance of caution

 6    view, that you are correct, that the judgment will issue as to

 7    everything but the restitution.  Once the restitution is

 8    determined, if there is restitution, there will be an amended

 9    judgment.  I would imagine, out of an abundance of caution, you

10    will note your appeal, and we will sort it out later.

11           MR. BALTER:  Very good.  Thank you.

12           THE COURT:  Okay.  All right.  Government, are there

13    prior indictments to dismiss as to Mr. Flores-Reyes?  Since

14    this was -- we were -- we went to trial on the 12th superseding

15    indictment?

16           MR. HAGAN:  We did, Your Honor, on the 12th, but that

17    was not the first indictment where Mr. Flores-Reyes was facing

18    counts, so the previous indictments that -- for which

19    Mr. Flores-Reyes was charged, the government would move to

20    dismiss.

21           THE COURT:  Okay.  And just to reaffirm that Count

22    Six on the 12th superseding indictment had been dismissed prior

23    to the beginning of trial.  Right?

24           MR. HAGAN:  That's correct, Your Honor.

25           THE COURT:  So that's dismissed, too, as to
```

1  Mr. Flores-Reyes.

2       Anything else that we need to discuss?

3          MR. BALTER:  No, Your Honor.  Thank you.

4          THE COURT:  Thank you all.

5       (The proceedings were concluded at 11:33 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3              I, Renee A. Ewing, an Official Court Reporter

4    for the United States District Court for the District of

5    Maryland, do hereby certify that the foregoing is a true and

6    correct transcript of the stenographically reported proceedings

7    taken on the date and time previously stated in the above

8    matter; that the testimony of witnesses and statements of the

9    parties were correctly recorded in machine shorthand by me and

10   thereafter transcribed under my supervision with computer-aided

11   transcription to the best of my ability; and that I am neither

12   of counsel nor kin to any party in said action, nor interested

13   in the outcome thereof.

14

15                    Renee A  Ewing

16

17                    Renee A. Ewing, RPR, RMR, CRR
                      Official Court Reporter
18                    May 24, 2023

19

20

21

22

23

24

25